Jeffrey S. Beelaert, Idaho Bar No. 12384
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Phone: (208) 388-1218
Fax: (208) 388-1300
jbeelaert@givenspursley.com

*Attorneys for Idaho Migration Alliance*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO MIGRATION ALLIANCE, | Case No. 25-509 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| DOUG BURGUM, in his official capacity as Secretary of the Interior, JON RABY, in his official capacity as acting Director of the Bureau of Land Management, CODIE MARTIN, in his official capacity as Field Manager at the Bureau of Land Management, UNITED STATES DEPARTMENT OF THE INTERIOR, and UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Defendants. | |

## <u>Introduction</u>

1.     The Bureau of Land Management approved a project designed to expand trail-based recreation and camping opportunities within the Wood River Valley in Blaine County, Idaho.  The project authorizes construction and maintenance activities on more than eighty-two miles of trails.  Yet, some of those trails improperly

provide thoroughfares for people to engage in recreational activities in critical ecosystems and in big-game habitat.    These trails crisscross big-game migration corridors, stopovers, and seasonal ranges, and these trails will displace big game from some of the only remaining large contiguous blocks of unfragmented habitat in the Wood River Valley.

2.    In its analysis of the project, the Bureau of Land Management did not adequately consider the environmental impacts of these trails on big game, even though the Idaho Department of Fish and Game warned the Bureau that increased recreational activities on certain trails would fragment existing habitat for big game and decrease habitat effectiveness.  The best available science confirms that repeated recreation-induced disturbances displace big game from their preferred habitats, causing long-term habitat fragmentation and loss, and ultimately reducing survival and reproduction for big game in the project area.  The Bureau's own wildlife biologist recognized these impacts.

3.    The Wood River Valley is home to several wildlife species, including mule deer, elk, and pronghorn.  The Bureau considers these big-game animals priority management species, which means that they are particularly important and that they warrant specific attention in the Bureau's analysis and decision-making. That should come as no surprise: the Secretary of the Interior has issued orders requiring the Bureau to prioritize the protection of big game, to conserve and/or improve big-game migration corridors and ranges, and to use the best available science when analyzing potential impacts to big game.  In this case, however, the Bureau did not follow the Secretary's mandatory guidance when it approved the project.

4.    Plaintiff Idaho Migration Alliance is a local nonprofit corporation.  The Alliance brings this lawsuit to hold the Bureau of Land Management accountable and to ensure that the agency complies with the law.  Neither the Bureau nor any other

federal agency can approve a project by relying on incorrect assumptions or inaccurate scientific data. Indeed, the National Environmental Policy Act prohibits uninformed agency decision-making, and the Bureau did not comply with the procedural requirements of that statute.

5.    Nor did the Bureau comply with the Federal Land Policy Management Act. The relevant resource management plan requires the Bureau to protect wildlife habitat in the project area. But this project does not protect big game or critical big-game habitat. A Bureau wildlife biologist concluded that the project will result in *habitat loss* for big game and that the project will have long-term *adverse impacts* to big-game species in the planning area. The decision to approve this project should be set aside.

## Jurisdiction and Venue

6.    This Court has jurisdiction over Idaho Migration Alliance's claims under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346(a)(2) (agency of the United States as the defendant), and 5 U.S.C. § 702 (judicial review). "The applicable statute of limitations, 28 U.S.C. § 2401(a)," requires the complaint to be filed within six years after the right of action first accrues—i.e., when the Alliance suffered an injury from the final agency action challenged here. *Corner Post, Inc. v. Board of Governors of Fed. Reserve System*, 603 U.S. 799, 808 (2024). The Alliance files this action within the applicable six-year limitations period.

7.    There now exists between the parties an actual, justiciable controversy within the meaning of the Declaratory Judgment Act. In this civil action, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

8.    "Further necessary or proper relief," including injunctive relief, may be granted by this Court "against any adverse party whose rights have been determined" in a declaratory judgment. 28 U.S.C. § 2202.

9.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because the Idaho Migration Alliance is a nonprofit corporation registered in Idaho, several members of the Alliance reside in this district, and a substantial part of the events or omissions giving rise to the Alliance's claims occurred in this district.

## Parties

10.    Plaintiff **Idaho Migration Alliance** is an active nonprofit corporation in good standing. Idaho Migration Alliance properly has registered with the Idaho Secretary of State under the Idaho Nonprofit Corporation Act, Idaho Code § 30-30-101, et seq. The Alliance and its members are committed to the preservation of recreational and aesthetic environmental interests associated with the protection of big-game migration routes and seasonal ranges near Lake Creek Canyon in the Wood River Valley. Members of the Alliance enjoy the scenic and ecological value of Lake Creek Canyon and the surrounding area, and they are committed to protecting local wildlife, big-game species, and the natural environment. Idaho Migration Alliance is headquartered in Ketchum, Idaho, where its members live, work, and recreate.

11.    Defendant **Doug Burgum** currently serves as the 55th Secretary the United States Department of the Interior.

12.    Defendant **Jon Raby** currently serves as the Acting Director for the Bureau of Land Management.

13.    Defendant **Codie Martin** previously served as the Field Manager for the Bureau of Land Management Shoshone Field Office. In his official capacity, Field Manager Martin signed the decision approving the project under review.

14.    Defendant **Department of the Interior** is an executive department of the United States government. The Department is responsible for the management and conservation of federal lands and natural resources.

15.    Defendant **Bureau of Land Management** is a bureau within the Department of the Interior responsible for administering federal lands. BLM's

mission is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. The Bureau is the largest land-management agency in the United States with more than 245 million acres of public lands under its supervision, much of which is found in western states like Idaho.

## Standing

16.    "Article III of the U.S. Constitution authorizes the judiciary to adjudicate only cases and controversies." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (internal quotation marks omitted). The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing has "three well-known" requirements:  injury-in-fact, causation, and redressability. *Davidson*, 889 F.3d at 967. A plaintiff bears the burden of demonstrating that its injury-in-fact is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

17.    In an environmental case like this one, the relevant showing "is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

18.    An organization "has standing to bring suit on behalf of its members when:  (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *accord Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 831 (9th Cir. 2021).

19.    The Bureau of Land Management approved a project designed to expand trail-based recreation and camping opportunities within the Wood River Valley,

where members of the Idaho Migration Alliance live and recreate. The project authorizes construction and maintenance activities on more than eighty-two miles of trails, with some trails located in big-game migration corridors that support critical ecological functions for winter and summer ranges as well as stopover and birthing habitats.

20.     Members of the Idaho Migration Alliance have standing to sue in their own right because they will suffer injuries to their recreational and aesthetic interests as project activities, especially as maintenance and construction activities, occur in sensitive areas. Members of the Alliance live in the project area; they enjoy seeing elk, mule deer, and local wildlife in their undisturbed natural habitats; and they are concerned that portions of the project do not adequately protect local wildlife and big-game migration corridors such that their interests will be harmed by the project.

21.     The Alliance was established by members of the Lake Creek Meadows Homeowners Association and by local residents in Blaine County, Idaho. The Alliance and its members are committed to the protection of big-game migration corridors overlooked by the Bureau of Land Management in the agency's analysis. Members frequently use the affected project area, and they are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activities. *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). Setting aside the Bureau's decision will redress their injuries.

22.     In this case, the Idaho Migration Alliance seeks to protect interests germane to the organization's purpose—i.e., preserving at-risk, navigable pathways within big-game migration corridors that serve critical ecological functions. Disruption and fragmentation from recreational activities within big-game migration routes and their seasonal ranges lead to serious consequences for local populations of mule deer, elk, and pronghorn. Adverse impacts to the behavior and health of big-

game populations will have cascading detrimental effects to the environment as these animals serve as prey for apex predators and carrion for scavengers. Big game help facilitate nutrient cycling, reduce fuels for wildfires, shape plant community dynamics, and enhance landscape connectivity.

## Legal Background

### A.    Federal Land Policy and Management Act

23.    In 1976, Congress enacted the Federal Land Policy and Management Act to establish a policy in favor of retaining public lands and to provide direction for their management. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). To comply with the Act, the Bureau of Land Management develops land-use plans, *see* 43 U.S.C. § 1712(c)(1), referred to as "resource management plans," 43 C.F.R. § 1601.0–1, which "are designed to guide and control future management actions," *id.* § 1601.0–2.

24.    The Bureau (through the Secretary of the Interior) manages public lands to comply with "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); *see also Gardner v. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Norton*, 542 U.S. at 58 (quoting 43 U.S.C. § 1702(c)).

25.    The Federal Land Policy and Management Act requires the Interior Secretary (and the Bureau) to manage public lands "in accordance with the land use plans" developed and published by the Department. 43 U.S.C. § 1732(a).

26.    In managing public lands, the Interior Secretary must "take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b). The Secretary has an ongoing obligation to "prepare and maintain on a continuing

basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." *Id.* § 1711(a).

27.     The 1981 Sun Valley Management Framework Plan guides the Bureau's management of public lands in the North Camas, Sun Valley, Big Wood, and Muldoon Analysis Units of the Shoshone Field Office.   The plan was amended in September 2015 by the Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management Plan Amendment.

28.     As explained in the Sun Valley Management Framework Plan, the Bureau seeks to manage big-game migration routes by minimizing impacts to big game.  Migration routes are important for the maintenance of healthy populations of big game, and the Management Plan emphasizes that the Bureau will manage big-game seasonal ranges and habitat based on the needs of the animals.

### B.     National Environmental Policy Act

29.     The National Environmental Policy Act "is a procedural statute, but its mandates are a 'basic national charter for protection of the environment.'" *Friends of the Inyo v. Forest Service*, 103 F.4th 543, 556 (9th Cir. 2024) (quoting *Center for Biological Diversity v. Forest Service*, 349 F.3d 1157, 1166 (9th Cir. 2003)).   NEPA sets a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).

30.     Federal agencies have a "continuing responsibility" under NEPA to fulfill their role as "trustee of the environment for succeeding generations;" to assure that all Americans have "safe, healthful, productive, and aesthetically and culturally pleasing surroundings;" to "attain the widest range of beneficial uses of the

environment" without degradation "or other undesirable and unintended consequences;" to preserve "natural aspects of our national heritage;" and to "achieve a balance between population and resource use." *Id.* § 4331(b)(1)–(5).

31.    NEPA "does not mandate particular results, but simply prescribes the necessary process" for an agency's environmental review of a project. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "Simply stated, NEPA is a procedural cross-check, not a substantive roadblock." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1507 (2025). "NEPA merely prohibits *uninformed*—rather than unwise—agency action." *Robertson*, 490 U.S. at 351 (emphasis added).

32.    The statute "has twin aims." *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97 (1983). First, NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Id.* (internal quotation marks omitted). Second, NEPA "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* NEPA thus assures that federal agencies reach "a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

33.    For a major federal action significantly affecting the quality of the human environment, an agency prepares a detailed environmental impact statement (EIS) to evaluate the proposed action. *See* 42 U.S.C. § 4332(2)(C).

34.    Yet not every proposed federal action requires an EIS. If it is unclear whether a proposed action significantly will affect the quality of the human environment, the agency instead may prepare "a more limited" environmental assessment. *San Diego Navy Broadway Complex Coalition v. Dep't of Defense*, 817 F.3d 653, 659 (9th Cir. 2016). The assessment "must in some circumstances include an analysis of the cumulative impacts of a project," *Native Ecosystems Council v.*

*Dombeck*, 304 F.3d 886, 895 (9th Cir. 2002), and the consideration of appropriate and reasonable alternatives, *Native Ecosystems Council v. Forest Service*, 428 F.3d 1233, 1246 (9th Cir. 2005).

35.    An environmental assessment "need not conform to all the requirements of an EIS, [but] it must be sufficient to establish the reasonableness of the decision not to prepare an EIS." *California Trout v. FERC*, 572 F.3d 1003, 1016 (9th Cir. 2009) (quoting *Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1215 (9th Cir. 2008)).   When the agency issues an environmental assessment, in which it explains why it decided not to prepare an environmental impact statement, the "agency may issue a finding of no significant impact ('FONSI') in lieu of preparing an EIS." *Native Ecosystems Council*, 428 F.3d at 1239.

36.    "NEPA requires agencies to take a 'hard look' at the environmental effects of a proposed action before implementing it." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022).

37.    "To take the requisite hard look, an agency 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts." *Id.* (quoting *Native Ecosystems Council v. Forest Service*, 418 F.3d 953, 964 (9th Cir. 2005)).   Instead, the agency must provide high-quality information and accurate

scientific analysis.  *350 Montana v. Haaland*, 50 F.4th 1254, 1272 (9th Cir. 2022) (citing 40 C.F.R. § 1500.1).[1]

38.    An agency cannot rely on general "statements about 'possible' effects and 'some risk'" to wildlife habitat and to animal populations without offering "a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998). "If a project may have potentially significant impacts on a local area or a local wildlife population, the agency must analyze such impacts." *WildEarth Guardians v. USDA Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 730 (9th Cir. 2025). "Conclusory assertions about insignificant impacts will not suffice." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022).

39.    Judicial review of an agency's environmental analysis "is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Seven County*, 145 S. Ct. at 1511; *see also* Ida(2); *Native Ecosystems Council*, 428 F.3d at 1238 (reviewing alleged NEPA violations under the Administrative Procedure Act).

---

[1] When Congress enacted NEPA in 1969, it created the "Council on Environmental Quality" (referred to as the CEQ).  42 U.S.C. § 4342.  A year later, in 1970, President Nixon issued an executive order instructing the CEQ to issue guidelines to federal agencies. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 910 (D.C. Cir. 2024).  And in 1977, President Carter empowered the CEQ to issue regulations and directed federal agencies to comply with those regulations.  *See id.*  But in reviewing regulations promulgated by the CEQ, the D.C. Circuit held in 2024 that no "statutory language states or suggests that Congress empowered CEQ to issue rules binding on other agencies—that is, to act as a regulatory agency rather than as an advisory agency."  *Id.* at 912.  "CEQ therefore had no lawful authority to promulgate these regulations."  *Id.* at 914.  Here, however, the CEQ's regulations—including 40 C.F.R. § 1500.1—were *still valid* during the planning process even though they no longer are valid today.  *See, e.g.*, Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025); *Corrigan v. Haaland*, 12 F.4th 901, 908 n.3 (9th Cir. 2021) (applying the law "as it was in effect" at the time of the agency action under review).

40.    "NEPA calls for the agency to focus on the environmental effects of the project itself." *Seven County*, 145 S. Ct. at 1517.  "An agency action is arbitrary and capricious if the agency has:  relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1069–70 (9th Cir. 2014) (quoting *Center for Biological Diversity v. BLM*, 698 F.3d 1101, 1109 (9th Cir. 2012)).

41.    An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choices made.  *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996).  For example, an agency's decision to approve a project is arbitrary and capricious if the agency "never explained" how an alternative may have satisfied important criteria under consideration.  *Center for Biological Diversity*, 141 F.4th at 992.

### Factual and Procedural Background

42.    On February 26, 2021, the Bureau of Land Management issued an environmental assessment in which the agency considered a proposed action along with alternatives "for expanding trail-based recreation and camping opportunities on BLM lands, and opportunities for connectivity to the existing Sawtooth National Forest (SNF) trail system while minimizing impacts to cultural and natural resources."  EA page 2 (§ 1.2).

43.    The Bureau defined the planning area as "bounded on the north by the SNF Ketchum and Fairfield Ranger Districts and the BLM-managed Lake Creek Trailhead, on the east by the Little Wood River, on the south by State Highway 20, and on the west by Willow Creek."  *Id.* at 3 (citing Appendix A, Map 1, attached here

as Exhibit A).[2]   The planning area includes federal (140,733 acres), state (25,603 acres), city (161,444 acres), and private lands.   But in its environmental assessment and subsequent decision, the Bureau of Land Management limited its analysis of environmental impacts to "BLM-managed lands only."   EA page 3 (§ 1.5).

44.   The Bureau initiated planning for the project in July 2017.   *Id.* at 1 (§ 1.1).   "The planning area was similar to the Blaine County Cooperative Conservation and Recreation plan and included roads and several miles of new trails within the greater Wood River Valley."   *Id.*

45.   The final environmental assessment "contains portions and components of the previous travel planning effort and all substantive public comments related to the proposed action received during these planning processes were used to help identify issues, formulate alternatives, and structure the analysis."   *Id.*

46.   Sometime in 2017, the Bureau of Land Management began a "scoping" process to determine the scope of issues to be addressed in its environmental analysis associated with the Wood River Valley Recreation and Access project. 40 C.F.R. § 1501.7 (2017).[3]

### A.   Idaho Department of Fish and Game

47.   The mission of the Idaho Department of Fish and Game is to preserve, protect, and perpetuate all wildlife within the State of Idaho.   Idaho Code § 36-103.

48.   To fulfill its mission, the Idaho Department of Fish and Game routinely coordinates with different partners—including private landowners, state and federal

---

[2] As stated in the environmental assessment (on page 79), "Maps are located on the BLM ePlanning website," https://eplanning.blm.gov/eplanning-ui/project/2000819/510.

[3] As explained above in footnote 1, the CEQ's regulations—including  40 C.F.R. § 1501.7—were still valid during the planning process even though they no longer are valid today.   *See Corrigan*, 12 F.4th at 908 n.3 (applying the law "as it was in effect" at the time of the agency action under review).

agencies, and non-governmental organizations—to implement policies designed to conserve big-game habitats across Idaho, including seasonal ranges and migration corridors for big game.

49.    **September 28, 2017 Letter**.  As part of the scoping process for this project, the Idaho Department of Fish and Game submitted a letter to the Bureau of Land Management.  *See* Exhibit B (attached here).  The Department explained that it had reviewed the "scoping package" developed by the Bureau for the Wood River Valley Travel Management Plan, and the Department stated that it provided comments to the Bureau "to assist the decision-making authority by providing technical information addressing potential effects on wildlife and wildlife habitat and how any adverse effects might be mitigated."  *Id.* (2017 Letter at 2).

50.    The Idaho Department of Fish and Game recognized that the "BLM-managed lands under consideration" in the Bureau's travel management plan "have a long history of providing hunters with good opportunities for harvesting mature mule deer bucks and bull elk."  *Id.*  The Department found, however, that "high road and trail densities and increasing motorized and mechanized use can compromise the quality and quantity of security habitat during the hunting season."  *Id.*  Indeed, the Department concluded that road and trail densities directly impact big-game distribution and vulnerability to mortality from hunter harvest.  *Id.*  Put another way, the Department stated:  "Increased access results in reduced security habitat for deer and elk, and generally increases harvest rates."  *Id.* (2017 Letter at 3).

51.    The Department explained that elk "are particularly susceptible to roads and motor vehicle traffic."  *Id.*  "In areas with high road densities, elk exhibit higher levels of stress and increased movement rates."  *Id.*  Increased recreational access can result in elk displacement "from preferred habitats," which also may compromise "survival and reproduction," especially "during sensitive seasons, such as winter" or during fawning/calving season.  *Id.*

52.    The Department identified several "issues" for the Bureau to consider. *Id.* For example, the Department referred to *redundancy.* "Some roads and trails" in the planning area, the Department stated, provided "access to the same areas" and were "likely unnecessary." *Id.* The Department urged the Bureau to develop a strategy to reduce redundancy in trails and roads in the planning area.

53.    The Department also suggested that the Bureau should implement seasonal closures and restrictions designed to protect "important deer fawning and elk calving habitats" as well as "deer and elk winter habitats." *Id.* "Seasonal closures of winter habitat should be assessed from the perspective of keeping deer and elk on native ranges rather than private property and/or near roadways." *Id.*

54.    As to elk, the Department specifically addressed "displacement." *Id.* The Department noted that elk generally move "away from roads and trails," and that this movement "may cause *substantial reductions* in habitat utilization and habitat effectiveness and has the potential to exacerbate elk depredation issues in the area." *Id.* (emphasis added). "Human disturbance associated with roads and trails negatively influences elk behavior because elk vacate otherwise suitable habitat to avoid human activity." *Id.*

55.    The Department urged the Bureau to consider a planning "compromise"—i.e., to balance "reasonable public access" and "wildlife habitat protection." *Id.* (Letter at 5). For example, the Department referred to the Brush Creek area, which "lies within the heart of the mule deer migration corridor." *Id.* Constructing "connector trails" in the Brush Creek area with "subsequent recreational use," the Department concluded, "would reduce the wildlife benefits of these important seasonal habitats" for mule deer. *Id.*

56.    Addressing non-motorized access—e.g., hiking and snow-shoeing—the Department stated that such access "is an on-going issue in the Wood River Valley." *Id.* Citing events that occurred during the winter months in 2016 and 2017, the

Department explained that it had "received numerous complaints throughout the valley about harassment of wintering big game by winter recreationists (and accompanying dogs)." *Id.* In particular, during its "winter aerial elk survey on the east side of the valley," the Department "observed a surprising number of trails made by snow shoeing and skiing on mid- and upper elevation winter range" for elk. *Id.* (Letter at 5–6). Historically, the Department observed that the harassment of big game occurs in close proximity to population centers (i.e., where people live), but the Department noted that the problem had become "much more widespread" during the winter months in 2016 and 2017. *Id.* (Letter at 6).

57.    The Department recommended that the Bureau "evaluate human entry closures on big game winter range in close proximity to population centers," and the Department offered its "assistance" to help develop "human entry closure options." *Id.*

58.    **<u>August 31, 2020 Letter</u>**. Three years later, the Idaho Department of Fish and Game submitted another letter to the Bureau of Land Management after the Department completed its review of the Bureau's draft environmental assessment for the challenged project. *See* Exhibit C (attached here). The Department stated that it generally "supports improving recreational access on public lands" so long as "adverse effects to fish and wildlife and associated recreation (i.e., hunting, fishing, and trapping) can be avoided, minimized, or mitigated." *Id.* (Letter at 1). The Department offered "technical information about big game and their habitats" to assist the Bureau in its ongoing decision-making efforts. *Id.*

59.    In many instances, the Department repeated comments that it had submitted in 2017, citing some of the same scientific literature. *Compare* Exhibit C, *with* Exhibit B.

60.    The Department reiterated that the planning area "provides important year-round habitat for mule deer and elk (i.e., winter, parturition, summer, and

migration)." Exhibit C (Letter at 2). Although the Bureau of Land Management did not quantify "levels of increased recreation or associated big game impacts" in the draft environmental assessment, the Department noted that all three action alternatives analyzed by the Bureau "would *increase* big game disturbance in all habitats." *Id.* (emphasis added).

61. The Department specifically referred to the Wildlife Specialist Report,[4] which "confirms that both mechanized and non-mechanized recreation disturb big game" and that "recreation-induced disturbance triggers behavioral changes" in big game (including "flight and habitat avoidance"). *Id.* As explained in the report, recreation-induced disturbances for big game "cause (1) habitat displacement, (2) habitat fragmentation and loss, (3) physiological stress (particularly during winter), and (4) fitness consequences (i.e., reduced survival and reproduction)." *Id.* The Wildlife Specialist Report, according to the Department, "concludes that each action alternative would cumulatively cause long-term additive wildlife disturbance and functional habitat loss compared to existing conditions." *Id.*

62. The Department noted that elk "in particular are displaced from otherwise suitable habitat along roads and trails." *Id.* Repeated recreation-induced disturbances "can displace elk" in the long term from their "preferred habitats, thereby (1) causing long-term habitat fragmentation and loss, (2) compromising energy conservation, and (3) ultimately reducing survival and reproduction." *Id.* (literature citations omitted). According to the Department, "disturbance impacts are particularly consequential for elk during winter" and during "calving"—a time in which "energy reserves are essential for survival and reproduction." *Id.*

63. "During the past 20 years," the Department stated that "unauthorized user-created routes and resulting recreation, including backcountry skiing and off-

---

[4] The full report is available on BLM's planning website for the project. It was prepared by a wildlife biologist from the Bureau of Land Management.

trail snowmobiling, have adversely impacted big game." *Id.* The Department again referred to the possibility of closing "some unnecessary existing routes." *Id.* (Letter at 3). And the Department suggested that many "more unnecessary routes (potentially user-created) appear to also occur in the planning area (e.g., e.g., 365A, 425A, 342A, 386A, 427A, 477A, 310A, 570A, 612A, 676A, 687A, 536A, 573A, etc.)." *Id.*

64. The Department stated that decommissioning and rehabilitating unnecessary routes would reduce "route densities," which, in turn, "would likewise reduce adverse impacts to big game from disturbance, displacement, and habitat fragmentation/loss" for big game. *Id.* "Strategically decommissioning more unnecessary routes might also afford additional new looping trail opportunities without increasing overall route densities and big game habitat fragmentation/loss." *Id.*

65. "Based on a literature review," the Department noted that the Wildlife Specialist Report concludes that recreation development proposed in the draft environmental assessment's "action alternatives would cause *unspecified* levels of direct, indirect, and cumulative adverse impacts on big game through disturbance, displacement, and habitat loss." *Id.* (emphasis added). Preferred Alternative D, the Department explained, includes a "proposed trail network" with a "net increase of 74.6 miles of new routes," which "would cause a net increase of route densities, and the resulting recreation would cause a *cumulative increase* in recreation conflicts with big game." *Id.* (emphasis added).

66. The Department flagged the Bureau's environmental analysis of Preferred Alternative D. Although the draft environmental assessment concluded that "adverse impacts on big game would be *minor to moderate*," the Department found that conclusion to be "*unsupported*" by the Bureau's analysis elsewhere in the administrative record. *Id.* (emphasis added).

67.    The Department specifically referred to what it deemed to be a "key"—
*yet incorrect*—assumption "for assessing the significance of big game impacts." *Id.*
The draft environmental assessment stated:    "Constructing and providing
sustainable trails opportunities would *decrease* user-created and illegally constructed
trails by providing a designated trail network which recreationists are more inclined
to use." *Id.* (emphasis added).

68.    Based on its review, however, the Department found that the draft
environmental assessment "and supporting documents provide *no scientific bases* for
(1) validating analysis assumptions; (2) designing adequate measures to avoid,
minimize, and mitigate adverse impacts (e.g., invasive and noxious weeds); or
(3) supporting a conclusion of only minor to moderate big game impacts." *Id.* (Letter
at 3) (emphasis added).

69.    As a result, the Department recommended that the Bureau address its
concerns in the final environmental assessment and in the corresponding agency
decision.  The Department offered three specific recommendations to the Bureau:

- "Incorporate a comprehensive evaluation and strategy to address
  existing unnecessary routes (e.g., route closures, decommissioning,
  restoration, etc.)."

- "To better understand the magnitude of potential impacts to big game
  and effectiveness of corresponding design features, provide estimates of
  important impact predictors (e.g., forecasted recreation distribution and
  levels by type) for each DEA action alternative that would affect existing
  big game distribution, habitats, and population parameters (include
  validation of analysis assumptions with empirical information and
  scientific literature if possible)."

- "Expand the DFMP"—referring to the Bureau's Design Features and
  Management Plan—"with detailed plans, measures, staffing, and

resources that will ensure adequate comprehensive effectiveness monitoring, enforcement, and adaptive management of design features necessary to avoid, minimize, and mitigate adverse recreation impacts to big game (e.g., enforcement of unauthorized user-created routes, decommissioning and rehabilitation of unauthorized or unnecessary routes, monitoring/treatment of weed infestations, etc.)."

*Id.*

70.    In its letter, the Department included a section titled, "Big Game Hunting and Security Habitat." *Id.* (Letter at 4).   Among other things, the Department noted that big-game hunting in the planning area "is a culturally and economically important recreational activity" that extends from late summer through spring for mule deer, elk, mountain lion, wolves, and black bear. *Id.* The Department referred to hunter surveys conducted between 1998 and 2011.   Those surveys indicated that "about 85% of hunters felt the number of roads/trails in their hunting area were adequate or excessive, and 75% would support or accept temporary road closures to improve big game hunting." *Id.*

71.    The Department emphasized *balance.*   Though federal lands in the planning area provide hunting opportunities to harvest big game, the Department found that excessive "hunter access (e.g., high route densities and mechanized travel)" nonetheless "can reduce big game security habitat" and negatively "alter herd distributions." *Id.*   The Department observed that mule deer and elk historically are "harvested at higher rates in densely roaded areas." *Id.*

72.    In the project area, the Department concluded that existing route densities "might already be relatively high for big game security needs." *Id.*   The Wildlife Specialist Report disclosed that "road densities of 0.17–0.62 km/km² can influence elk habitat effectiveness." *Id.*   And, because the Bureau's Preferred Alternative D *increases* route densities, the Department worried that this alternative

"would further fragment existing habitat, decrease habitat effectiveness, and particularly shrink security habitat for big game." *Id.*

73.    As an example, the Department referred to "the proposed new trails connecting Slaughterhouse and Quigley canyons," suggesting that those new trails "would considerably reduce big game security habitat in one of only three remaining large contiguous blocks of unfragmented big game habitat in the planning area." *Id.* (citing Maps 15 and 19 found in the draft environmental assessment).  According to the Department, these proposed new trails will "eliminate a remaining opportunity for a more primitive hunting experience." *Id.*

74.    The Department considered the three action alternatives analyzed in the draft environmental assessment and concurred with the Bureau "that Alternative C's lowest route densities would have the least adverse impacts to big game and their habitats," while still "affording new recreational access in the planning area." *Id.*    In contrast, the Department found that "Preferred Alternative D's 74.6 net miles of new routes are likely *unnecessary* to serve most big game hunters in the planning area." *Id.* (emphasis added).  The Department suggested that, with "additional clarity and specifications," Preferred Alternative D potentially could provide closures and use restrictions for big-game winter range and winter-range protections. *Id.*

75.    The Department concluded that the Bureau's Design Features and Management Plan "currently provides little practical information about how BLM would administer, monitor, enforce, and adapt design features necessary to avoid, minimize, and mitigate what might otherwise be *substantial adverse recreation impacts to big game*." *Id.* (Letter at 4–5) (emphasis added).

76.    As a result, the Department recommended that the Bureau consider in the final environmental assessment and in the corresponding agency decision a way

to address its concerns. The Department again offered three specific recommendations to the Bureau:

- "Implement Alternative C's new routes and Preferred Alternative D's winter range Seasonal Closures and Use Restrictions to maintain quality big game habitat (e.g., security habitat) while providing a diversity of associated hunting access options and experiences (i.e., motorized, mechanized non-motorized, and non-motorized)."

- Expand the Design Features and Management Plan to include "detailed plans, measures, staffing, and resources that will ensure adequate comprehensive effectiveness monitoring, enforcement, and adaptive management of design features necessary to avoid, minimize, and mitigate adverse recreation impacts to big game (e.g., winter range Seasonal Closures and Use Restrictions, etc.)."

- "Remove proposed new trails connecting Slaughterhouse and Quigley canyons from all action alternatives to (1) maintain existing hunting opportunities, (2) decrease big game vulnerability, and (3) prevent new habitat fragmentation/loss in this remaining large contiguous block of important big game habitat."

*Id.* (Letter at 5).

77.    In its letter, the Department included a section titled, "Winter Range Seasonal Closures and Use Restrictions." *Id.* The Department explained that the "planning area provides important winter range (e.g., 223,718 acres of elk winter range)"—citing Section 2H in the Wildlife Specialist Report—"and corresponding seasonal migration routes (e.g., 128,265 acres of mule deer migration habitat)," again citing the same section of the report, that are "necessary to support the culturally and economically important big game populations in the planning area." *Id.*

78.    The Idaho Department of Fish and Game further explained that Department of Interior Secretarial Order 3362 (referred to as SO3362) "directs the BLM to assist state fish and wildlife agencies with *conserving* priority big game winter ranges and migration habitats." *Id.* (emphasis added).  According to the Idaho Department of Fish and Game, the "planning area contains both crucial winter range and migration routes for mule deer and elk populations associated with the Smoky-Boise Priority Area for implementing SO3362 in Idaho." *Id.*

79.    By way of background, Secretary of the Interior Ryan Zinke signed Secretarial Order 3362 on February 9, 2018, and the order was issued specifically to *improve* habitat quality of big-game migration corridors and big-game seasonal ranges.  *See* Exhibit D (attached here).[5]  The order directs all bureaus within the Department of the Interior to work in close partnership with several Western states, including Idaho, "to enhance and improve the quality of big-game winter range and migration corridor habitat on Federal lands under the management jurisdiction" of the Interior Department "in a way that recognizes state authority to conserve and manage big-game species." *Id.* (Order at 1).  The order states that the Interior Department will work with state partners and others "to *conserve* and/or *improve* priority western big-game winter range and migration corridors." *Id.* (Order at 2) (emphasis added).

80.    To comply with the order, the Bureau must evaluate and apply "site-specific management activities" designed to "conserve or restore habitat necessary to sustain local and regional big-game populations." *Id.* (Order at 5, § 4(b)(5))

81.    In particular, the order provides "direction regarding land management actions to improve habitat quality for big-game populations that could help ensure

[5] In August 2020, the Department of the Interior released a report titled, "Secretarial Order 3362:  Improving Habitat Quality in Western Big Game Winter Range and Migration Corridors."  As Appendix A, that report included a copy of Secretarial Order 3362, and that version has been attached here as Exhibit D.

robust big-game populations continue to exist." *Id.* (Order at 2). "Further, SO 3866 includes a number of directives related to working with States and using *the best available science* to inform development of guidelines" and policies. *Id.* (emphasis added).

82.    The order unequivocally requires the Bureau of Land Management to "use the best available science" whenever the agency develops guidelines or conducts planning activities. *Id.* (Order at 3, § 3(d)).

83.    The best available science may come from other agencies, as the order directs all federal agencies within the Interior Department to work closely with state agencies, such as the Idaho Department of Fish and Game. The order requires the Bureau of Land Management, and all other Interior bureaus, to assess "State wildlife agency data regarding wildlife migrations early in the planning process for land use plans and significant project-level actions." *Id.* (Order at 4, § 4(b)(4)).

84.    The order directs the Bureau to *avoid* "development in the most crucial winter range or migration corridors during sensitive seasons," to *minimize* "development that would fragment winter range and primary migration corridors, and to *limit* "disturbance of big game on winter range." *Id.* (Order at 5) (§ 4(b)(5)(iv)– (vi)).

85.    With respect to science, the Interior Secretary directed federal agencies to proceed "in close cooperation with the States" and state agencies before "developing maps or mapping tools related to elk, deer, or pronghorn movement or land use." *Id.*; *accord* Department of Interior Secretarial Order 3356, *Hunting, Fishing, Recreational Shooting, and Wildlife Conservation Opportunities and Coordination with States, Tribes, and Territories* (Sept. 15, 2017).[6]

---

[6] Over the years, the Idaho Department of Fish and Game and the Department of the Interior jointly have developed an "Idaho Action Plan" for managing pronghorn, mule deer, and elk winter range and migration routes. The action plan began with Version 1.0 in 2018, and it has carried forward to Version 5.0 issued in 2023.

**B.    2020 Ungulate Migration Report**

86.    In 2020, the United States Department of the Interior and the United States Geological Survey jointly published Scientific Investigations Report 2020-5101, titled "Ungulate Migrations of the Western United States, Volume 1." *See* Exhibit E (excerpted pages) (attached here).  The report was prepared consistent with guidance from Interior Secretarial Orders 3356 and 3362, as well as other orders, requiring all Interior bureaus to work collaboratively with state agencies and to use the best available science to minimize potential negative impacts on wildlife in planning projects and in approving agency actions.

87.    State agencies across the western United States—including the Idaho Department of Fish and Game—collaborated with the Department of the Interior and the United States Geological Survey to collect and to analyze tracking data from big game, including mule deer, elk, bison, moose, and pronghorn.

88.    Mapping teams compiled and then analyzed GPS-tracking data from several big-game species to identify "26 corridors, 16 migration routes, 25 stopovers, and 9 winter ranges" across Arizona, Idaho, Nevada, Utah, and Wyoming.  *Id.* (Report at 1).  The 2020 Ungulate Migration Report, and the associated release of that scientific data, was meant to "provide the means for the habitats required for migration *to be taken into account* by state and federal transportation officials, land and wildlife managers, planners, and other conservationists working to maintain big-game migration in the western states." *Id.* (emphasis added).

89.    Historically, "wildlife managers knew that specific herds were migratory, but lacked detailed delineation of the migrations." *Id.* (Report at 2).  The 2020 Ungulate Migration Report filled that void because it provided critically important information for agency decision-makers to consider.   Indeed, the "identification and mapping of migration corridors has proven to be a powerful means to advance science-based conservation and wildlife management." *Id.* (Report at 3).

90.     Migration "corridor identification can facilitate critical on-the-ground management and conservation" decisions for state and federal land managers.  *Id.* Relevant here, the report identified two big-game migration routes and seasonal ranges in the planning area where two different mule deer herds overlap.

### (1) Antelope Creek Mule Deer Herd Migration Corridor

91.     The first herd, referred to as the "Antelope Creek mule deer," includes "between 1,300 and 1,850 mule deer" that "migrate westward through the White Knob and Pioneer Mountains towards Ketchum."  *Id.* (Report at 11).  "On average, Antelope Creek mule deer travel more than 42 mi (68 km) to migrate between summer and winter ranges with the farthest individuals traveling close to 110 mi (177 km)."  *Id.*  Individual mule deer from this herd may move to areas used by an adjacent mule deer herd during winter months or whenever the two herds "share migration routes and summer ranges."  *Id.*

92.     The Antelope Creek mule deer herd is present in the project area, as the herd uses habitat along Trail Creek Road, including Lake Creek Canyon and Taylor Canyon, for migration routes, stopovers, and seasonal ranges.  *See id.* (Report at 10); Exhibit F (Figure 4).

### (2) Mt. Borah Mule Deer Herd Migration Corridor

93.     The second herd, referred to as the "Mt. Borah mule deer," includes "roughly 400–500 individuals" that migrate westward from the Lost River Range, "past Thousand Springs Valley, following the Big Lost River drainage to reach their summer range north of Ketchum in the Smoky Mountains."  Exhibit E (Report at 25). "On average, these mule deer migrate nearly 50 mi (80 km), and some migrate as far as 73 mi (117 km)."  *Id.*

94.     The Mt. Borah mule deer herd uses a migration route that follows Trail Creek Road in Ketchum "quite closely."  *Id.*  "Continued improvements to Trail Creek

Road and associated infrastructure development could result in deer mortalities due to increased traffic." *Id.*

95.    Like the Antelope Creek mule deer herd, the Mt. Borah mule deer herd is present in the project area, as the herd uses habitat along Trail Creek Road, including Lake Creek Canyon and Taylor Canyon, for migration routes, stopovers, and seasonal ranges. *See id.* (Report at 24); Exhibit F (Figure 3).

96.    In addition, the 2020 Ungulate Migration Report noted that "human development, particularly in GMU 49, could prove *detrimental* for migrating and summering mule deer."    Exhibit E (Report at 25) (emphasis added).    Game Management Unit 49—i.e., GMU 49—encompasses a portion of the Wood River Valley that includes the entire project area.

### C. Wildlife Specialist Report

97.    In February 2021, a wildlife biologist from the Bureau of Land Management prepared a Wildlife Specialist Report that analyzed project impacts on a variety of species, including big game. *See* Exhibit G (excerpted pages) (attached here).

98.    The wildlife report characterized the project as providing "thoroughfares for human activity" in the planning area. *Id.* (report at 27).  And in reviewing the scientific literature, the report stated that big-game animals "may alter their behavior to focus on active threats or flee to avoid a perceived threat." *Id.*  The report "assumed that displacement and avoidance behaviors would *increase* as the volume of human use increases in the presence of animals." *Id.* (emphasis added).  Indeed, the "displacement of big game may limit habitat effectiveness and may contribute to elk depredation issues on adjacent private lands." *Id.*  In short, the Bureau's wildlife biologist found that reducing "habitat use is a form of *habitat loss*" for big game in the project area. *Id.* (emphasis added).

99.    The Bureau's wildlife biologist found that trail use in the project area "will occur during all seasons but would be greatest in the spring/summer/fall." *Id.* (report at 29). "Overall," the wildlife biologist concluded that "recreation use would be variable and could occur each day and may be *high for some trails* and under the action alternatives would represent a *net increase in human activity* including during the winter season in occupied big game winter habitats that would be expected to *increase* interactions between wintering big game and recreation users." *Id.* (emphasis added).

100.    Consistent with comments submitted by the Idaho Department of Fish and Game, the Bureau's wildlife biologist recognized that the project area "is known to support wintering big game animals," and that recreational activities by humans "would be *expanded* under all action alternatives that could occur each day with some trails potentially experiencing high amounts of activity." *Id.* (emphasis added); *see also id.* (report at 45) ("Cumulatively, each of the alternatives, except the no action, would expand recreation use on the landscape with varying degrees of disturbance and habitat loss.").

101.    The Wildlife Specialist Report purported to identify winter ranges for mule deer and elk, and it purported to identify mule deer migration corridors:



*Id.* (report at 64).

102.    But the northern most area of the Bureau's map (near Sun Valley and Ketchum) did *not* include the two migration corridors identified in the 2020 Ungulate Migration Report prepared by the United States Department of the Interior and the United States Geological Survey, which was published a year earlier in 2020.  *See* Exhibit E (report at 10) (Antelope Creek mule deer migration corridor); *id.* (report at 12) (Mt. Borah mule deer migration corridor).

103.    The omission of these migration corridors is significant because the Bureau fails to identify known scientific knowledge of the pathways and critical stopovers used by these two big-game herds.  Without that critical information, there

can be no meaningful analysis of impacts to these herds or to their mitigation routes. These areas not only serve critical life-cycle functions directly related to successful population recruitment, but also provide potential genetic benefits of population overlaps linking wider mule deer populations.

104.    Moreover, the Bureau of Land Management identified an Area of Critical Environmental Concern (ACEC) near the Sun Peak area.  The ACEC overlaps with the Antelope Creek mule deer migration corridor and the Mt. Borah mule deer migration corridor (which were *not* considered in the Bureau's analysis). Although the Bureau considered rerouting an "existing trail within the Sun Peak Area of Critical Environmental Concern," the Bureau ultimately *dismissed* that alternative because the Sun Valley Company had constructed other nearby trails that provided "a more sustainable" option in the same proximity.  EA page 19.  The nearby Sun Valley trails are located near the White Clouds subdivision along Trail Creek Road, and these trails primarily cross private lands.

### D.  BLM Trail 998A and unapproved USFS Trail 998B

105.    The Bureau of Land Management approved the project "to expand trail-based recreation and camping opportunities within the Wood River Valley." Exhibit H (decision at 2) (attached here).

106.    At the same time, however, the Bureau noted that the project area already includes "86.3 miles of existing trails."  EA page 16.  The Bureau found that many of "these existing trails are not considered sustainable."  *Id.*  "During the last 20 years, across all types of recreation," the Bureau explained that "routes have been created and/or constructed *without permission* across BLM, State and private lands." *Id.* (emphasis added).

107.    "This unauthorized activity has resulted in *increased impacts* to natural resources and disturbance to wildlife species, including deer and elk, during the

winter months; especially recreation activity during winters when enough snow is present for backcountry skiing and snowmobiling off-trail." *Id.* (emphasis added).

108.    The Sun Valley Company constructed the White Clouds subdivision trail network in 2008.  At some point over years since then, an *unauthorized* foot path was created nearby by local users without permission from the BLM.  The user-created footpath branches north from the White Clouds subdivision trail network into Lake Creek Canyon, and it traverses BLM land, crossing through the Sun Peak Area of Critical Environmental Concern as well as the Antelope Creek mule deer migration corridor and the Mt. Borah mule deer migration corridor.  The unauthorized user-created footpath is depicted in yellow on this map (branching off from the White Clouds trail network depicted in purple).[7]



---

[7] This map was created by Will Miller Consulting LLC and NS Consulting, PLLC, using information compiled from the administrative record and from local, state, and federal sources.  *See* Exhibit F, Figure 2 (attached here).

109.    The user-created footpath has never been an inventoried trail.  Instead, it has existed only as an *unauthorized* route created by local users.  Neither the Bureau of Land Management nor any other federal or state agency has authorized the footpath, which traverses over BLM land and through the Sun Peak Area of Critical Environmental Concern.

110.    In approving this project, the Bureau authorized the use of a *different* trail—referred to as BLM Trail 998A (depicted on the above map as a dashed red line)—but that trail does not actually connect to the existing White Clouds subdivision trail network.  *See, e.g.*, Map 17 (on the BLM ePlanning website); Map 19 (same).  Trail 998A instead connects to the *unauthorized* user-created footpath.  From the south (i.e., from the White Clouds subdivision) traveling north, there is *no* authorized access to Trail 998A from any other trail, including the existing private trail network near the White Clouds subdivision (depicted on the above map in purple).

111.    Nor is there authorized access to Trail 998A from the other direction. There was once a *proposed* Forest Service trail—referred to as USFS Trail 998B— that potentially could have connected to BLM Trail 998A.  But that proposed trail was *never authorized* by the Forest Service.

112.    Proposed USFS Trail 998B is located along Lake Creek Drive, which branches off of Highway 75 in Ketchum, with the proposed trailhead just past the Lake Creek subdivision.  USFS Trail 998B is depicted on the below map as a hashed blue line, which connects to the hashed red line for BLM Trail 998A.[8]

---

[8] These maps were created by consultants using information from the administrative record and from local, state, and federal sources.  *See* Exhibit F.



113.    Proposed USFS Trail 998B originates in Taylor Canyon (in the north), and it traverses over a ridge to Lake Creek Canyon (in the south), ending at BLM Trail 998A.  Importantly, though, USFS Trail 998B was never approved by the Forest Service or by the Bureau of Land Management.  So, there is no authorized access to BLM Trail 998A from either direction.  In the north, BLM Trail 998A is connected only to *unauthorized* Proposed USFS Trail 998B.  And in the south, BLM Trail 998A is connected only to the *unauthorized* user-created footpath.

114.    In approving this project, the Bureau authorized trails that provide thoroughfares for human activity near critical ecosystems.  Indeed, these specific trails directly cross through big-game migration corridors, seasonal ranges, and big-game habitat.  Yet the Bureau of Land Management did not adequately consider the

environmental impacts of these trails on big game in its analysis.  The Bureau failed to take a "hard look" at the impacts of these trails on big game.

115.    The Idaho Department of Fish and Game has not waivered in expressing its opposition to increased human activity and increased development in this area. The Department steadfastly has opposed trails that negatively impact big game and critical habitat in this area.  For example, in 2023, the Forest Service proposed a project that included the expansion of a parking lot on Lake Creek Road along with some connector trails.  In reviewing that project, the Department reiterated the same concerns that it previously had raised in 2020 as it evaluated this project.

116.    The Department explained to the Forest Service that any "increased infrastructure capacity at Taylor Canyon trailhead"—located along Lake Creek Road north of the Lake Creek subdivision—"will result in an increase of recreational use in the canyon, and significant increases in recreation may result in impacts to wildlife populations."  Exhibit I (attached here) (letter at 1).  The Department found that impacts to big game should be minimized "by *avoiding* new trail development."  *Id.* (emphasis added).

117.    The Department stated:  "New trail development near Taylor Canyon or within the Lake Creek drainage would warrant *additional environmental review*, due to the likelihood of impacts to big game populations that use this vicinity for migrations and summer parturition habitat."  *Id.*  (emphasis added).

118.    The Department explained that the Forest Service's proposed improvements were located near "resources of interest to recreationists," which "include habitat for big game (mule deer, elk, moose, black bear, mountain lion, gray wolf)" as well as upland birds and other species.  *Id.*  "The published Mt. Borah and Antelope Creek mule deer migrations travel through this canyon annually and use the surrounding vicinity for seasonal summer habitat, and increased human development is anticipated to be a foremost potential threat to both of these

migrations." *Id.*; *see also* Exhibit E (excerpts from the 2020 Ungulate Migration Report).

119.   "Based on biologist observations," the Department noted that "elk also use this canyon for spring calving and seasonal summer habitat."  Exhibit I (letter at 1).  "Increases in recreational use have been shown to impact terrestrial wildlife, including in reductions of habitat occupancy and nutritional condition." *Id.* (citations omitted).

120.   As the Department did when it submitted comments to the Bureau of Land Management for the challenged project, the Department reiterated that *any* new trail development in this area would cause "habitat fragmentation/loss" to one of the few remaining large contiguous blocks of critical big-game habitat in the Wood River Valley.  *Id.* (internal quotation marks omitted).

121.   And the Department added:  "The preclusion of new trail development is also pertinent to the vicinity surrounding Taylor Canyon and IDFG *recommends against* the development of new trails in this area, particularly in the contiguous habitat between Taylor Canyon and Sun Valley (south of the [Forest Service's] proposed parking expansion)." *Id.* (letter at 2) (emphasis added).

122.   According to the Idaho Department of Fish and Game, the preclusion of "new trails in this area for the benefit of existing big game migrations is consistent with IDFG's management priority to protect and improve movement along migration pathways." *Id.* (internal quotation marks omitted).  The Department also believed that precluding the development of new trails in this area is "consistent with current federal guidance on wildlife migrations."  *Id.* (citing Brenda Mallory, CEQ Chair, *Memorandum for Heads of Federal Departments and Agencies* (Mar. 21, 2023) (attached here as Exhibit J)).

123.   In accord with guidance from Department of Interior Secretarial Order 3362 (discussed above), the CEQ Memorandum instructs federal agencies,

"consistent with their statutory authorities and specific missions," to incorporate the objectives of the CEQ's guidance "for conserving, enhancing, protecting, and restoring connectivity and corridors" for big game and other species "into agency actions to the maximum extent practicable."  Exhibit I (memo at 3).

124.    Ultimately, the Forest Service did *not* proceed with the proposed project in 2023.  Here, however, the Bureau of Land Management approved BLM Trail 998A (and other trails) without meaningfully considering potential impacts to big game— including impacts to the habitats and migration corridors used by the Mt. Borah mule deer herd and the Antelope Creek mule deer herd.  These migration corridors pass through Lake Creek Canyon and the surrounding vicinity, and it is well established that increased human activity is considered to be the foremost threat to big-game migration corridors.  The best available science confirms that threat.  Yet the Bureau entirely failed to consider it.

**E.  The Bureau's environmental assessment**

125.    In its environmental analysis of this project, the Bureau of Land Management did not consider information published in the 2020 Ungulate Migration Report even though the report had been released in the previous year before the project was approved and before the Bureau issued the final environmental assessment.

126.    As discussed above, the 2020 Ungulate Migration Report and the associated release of scientific data in the report, was meant to "provide the means for the habitats required for migration *to be taken into account* by state and federal transportation officials, land and wildlife managers, planners, and other conservationists working to maintain big-game migration in the western states." Exhibit C (Report at 1) (emphasis added).

127.    The Bureau claimed in its environmental assessment that the agency complied with several statues, regulations, manuals, and handbooks as it analyzed

the environmental impacts of the project. *See* EA pages 2–3 (§ 1.4). Among the list of cited authorities, the Bureau claimed that it complied with Interior Secretarial Order 3362. It did not.

128. Secretarial Order 3362 requires the Bureau to work with state partners—e.g., the Idaho Department of Fish and Game—"to *conserve* and/or *improve* priority western big-game winter range and migration corridors." Exhibit D (Order at 2) (emphasis added). The project does neither one of those things. It does not "conserve" or "improve" big-game seasonal ranges or migration corridors because the project expressly was designed to *expand* trail-based recreation in the Wood River Valley, including in the Lake Creek Canyon and Taylor Canyon area, through which the big-game migration routes pass.

129. The Bureau did not use the best available science as it analyzed potential impacts to big game in the project area, even though Interior Secretarial Order 3362 requires the Bureau to use the best available science in its analysis. *See id.* For example, the Bureau did not take into account the scientific data found in the 2020 Ungulate Migration Report. The Bureau did not even *identify* the Mt. Borah and Antelope Creek mule deer herds or their migration routes by name, let alone *analyze* potential adverse impacts to these herds, to their habitat, or to their migration corridors.

130. In its analysis of cumulative impacts to big game, the Bureau recognized that elk and mule deer "have been known to migrate" in the Big Wood River Valley. EA page 33. Yet the Bureau provided no detailed information regarding elk and mule deer migration, even though it was available to the agency at the time that it completed its environmental analysis. The Bureau merely suggested that migrating big game "may be disturbed" in the planning area and that "over time" impacts to big game and their habitats may increase as population growth increases. *Id.*

131.   The Bureau suggested that the agency would apply "design features and education efforts to inform recreation users of big game conflicts," but the Bureau provided no meaningful explanation as to how these unspecified "features" and "efforts" somehow will "*reduce* impacts and *not* result in impacts that would obstruct viable populations" of big game in the project area.  *Id.* (emphasis added).

132.   The Bureau's cursory analysis is inconsistent with Interior Secretarial Order 3362, which requires the Bureau to "conserve and/or improve" big-game winter range and migration corridors.  Exhibit D (Order at 2).

133.   The Bureau recognized "ongoing disturbances to animals and their habitats" in the project area.  EA page 33.  And in purporting to analyze cumulative impacts to big game from the project—which the Bureau specifically designed to *expand* trail-based recreation in the Wood River Valley—the Bureau concluded that "alterations" to existing wildlife habitat "from the respective action alternatives in addition to ongoing disturbances to animals and their habitats is *not* expected to result in more than *minor cumulative effects* to big game."  *Id.* (emphasis added).

**F.  Decision Record and Finding of No Significant Impact**

134.   On February 26, 2021, the Bureau of Land Management issued a decision approving the construction, use, and maintenance of more than eighty-two miles of trails in the Wood River Valley.  *See* Exhibit H.

135.   According to the Bureau, the decision allows the agency "to expand trail-based recreation and camping opportunities within the Wood River Valley while minimizing impacts to natural and cultural resources."  *Id.* (decision at 2).  The Bureau  claims that the decision to approve the project will have "numerous" unspecified "*environmental benefits*."  *Id.* (emphasis added).

136.  The Bureau concluded that project activities analyzed in the environmental assessment "will not significantly affect the quality of the human environment."  *Id.* (decision at 3).  Accordingly, the Bureau "determined that the

preparation of an Environmental Impact Statement is not necessary." *Id.*; *see also* Exhibit K (Finding of No Significant Impact) (attached here).

137.    Under then-existing regulations, the Bureau considered the "context" and "intensity" of potential environmental impacts. *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (quoting 40 C.F.R. § 1508.27). The Bureau considered "ten non-exhaustive factors that inform an agency's intensity determination." *Bark v. United States Forest Serv.*, f, 869 (9th Cir. 2020) (citing 40 C.F.R. § 1508.27(b)); *see also* Exhibit K.

138.    For two of the intensity factors, the Bureau considered whether the project is "highly controversial" or whether environmental effects from the project are "highly uncertain." 40 C.F.R. §§ 1508.27(b)(4), (b)(5) (2021). The Bureau found that the project was not highly controversial because it is "not uncommon" to construct or to use "trails, trailheads, and campsites" in the planning area. Exhibit K (FONSI at 2). And the Bureau found that the environmental effects of the project were not highly uncertain as the "project is not unique or unusual." *Id.* The Bureau stated that the agency "has experience implementing similar actions in similar areas," and that it "fully analyzed" environmental effects in the environmental assessment. *Id.*

### G.  2025 Ungulate Migration Report

139.    In February 2025, the United States Department of the Interior and the United States Geological Survey jointly published Scientific Investigations Report 2024-5111, titled "Ungulate Migrations of the Western United States, Volume 5." *See* Exhibit L (excerpted pages) (attached here). Like the 2020 Ungulate Migration Report discussed above, the 2025 report was prepared consistent with guidance from Interior Secretarial Orders 3356 and 3362 (as well as other orders) requiring all Interior bureaus to work collaboratively with state agencies and to use the best

available science to minimize potential negative impacts on wildlife in planning projects and in approving agency actions.

140.    The 2025 Ungulate Migration Report "details migrations and seasonal ranges from 36 additional herds and includes 2 herd updates detailed in previous reports." *Id.* (Report at 1).  Through five volumes, the "Corridor Mapping Team has mapped the migrations and seasonal ranges of 218 unique herds for the report series." *Id.*  And the "most useful aspect of this report series is the ways in which the migration maps are being used for on-the-ground management and conservation" by agencies like the Bureau of Land Management.  *Id.* (Report at 2).  As depicted on the map of Idaho, the 2025 Ungulate Migration Report identifies migration routes used by mule deer, elk, and pronghorn that occur within the project area.  *Id.* (Report at 4).

141.    Relevant here, the 2025 Ungulate Migration Report identified a third herd of mule deer—referred to as the "Owinza mule deer herd"—that migrate from "sagebrush-steppe habitat near Owinza, Idaho," north "toward higher elevation habitats within the Sawtooth National Forest and valleys near the Big Wood River" near Hailey and occasionally further north into the Sun Valley area.  *Id.* (Report at 21); *see also* Exhibit F (Figure 8).

142.    The Owinza mule deer herd utilizes seasonal range habitat that overlaps with the Antelope Creek mule deer herd described above (at ¶¶ 91–92).  Exhibit L (Report at 21).  Again, there are potential genetic benefits to mule deer whenever one herd overlaps with another herd, thus linking wider mule deer populations.

## Causes of Action

### COUNT I:  Violation of NEPA
### The Bureau failed to take a "hard look" at impacts to big game.

143.    Idaho Migration Alliance incorporates by reference the above paragraphs (¶¶ 1–142) as if set forth here.

144.   In approving this project, the Bureau failed to reach "a fully informed and well-considered decision." *Vermont Yankee*, 435 U.S. at 558.

145.   NEPA "establishes action-forcing procedures that require agencies to take a hard look at environmental consequences." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000)).

146.   "To take the requisite hard look, an agency 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts." *Env't Def. Ctr.*, 36 F.4th at 872 (quoting *Native Ecosystems Council*, 418 F.3d at 964).

147.   The Bureau must provide high-quality information and accurate scientific analysis to comply with NEPA. *350 Montana*, 50 F.4th at 1272; *see also* 40 C.F.R. § 1500.1(b) (2021).    General statements about potential impacts or indeterminate risk to big game do not constitute a hard look. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).

148.   As explained in the BLM's own NEPA Handbook (H-1790-1) § 6.8.1.2 (2008), to satisfy the "hard look" requirement, the Bureau must provide "a reasoned analysis containing quantitative or detailed qualitative information."  And, in taking a hard look at the potential environmental effects of a project, the Bureau must use "the best available science to support" its analysis. *Id.*; *accord* Exhibit D (Secretarial Order 3362 at 3) (requiring the Bureau to "use the best available science" whenever it conducts planning activities).

149.   The Bureau designed this project to *expand* trail-based recreation in the Wood River Valley, yet the Bureau failed to take a hard look at how an undisputed *increase* in human recreational activities negatively will impact big game in the northernmost areas of the project.  Specifically, the Bureau did not take a hard look at increased big-game disturbances in the vicinity of Lake Creek Canyon.

150.    Nor did the Bureau use the best available science as it analyzed potential impacts to big game in that area.  A year before the Bureau approved this project, the United States Department of the Interior and the United States Geological Survey jointly published the 2020 Ungulate Migration Report.  Exhibit E. That report, and the associated release of scientific data, was meant to "provide the means for the habitats required for migration *to be taken into account* by" the Bureau as it works to maintain big-game migration corridors.  *Id.* (Report at 1) (emphasis added).  In its analysis, however, the Bureau did not take the report, or any of the report's scientific data, into account as it considered potential impacts to big game in the vicinity of Lake Creek Canyon.

151.    The Bureau claimed that it complied with Interior Secretarial Order 3362 in its NEPA analysis, but the agency plainly did not do so.  Secretarial Order 3362 requires the Bureau to "*conserve* and/or *improve*" big-game winter ranges and migration corridors.  Exhibit D (Order at 2) (emphasis added).  And the order directs the Bureau to *avoid* "development in the most crucial winter range or migration corridors during sensitive seasons," to *minimize* "development that would fragment winter range and primary migration corridors, and to *limit* "disturbance of big game on winter range."  *Id.* (Order at 5) (§ 4(b)(5)(iv)–(vi)).

152.    Even in its flawed analysis, the Bureau recognized that the project will "result a *net increase* in human activity including during the winter season in occupied big game winter habitats that would be expected to *increase* interactions between wintering big game and recreation users."  Exhibit G (specialist report at 29) (emphasis added).  Increasing recreational activities in critical big-game habitat is inconsistent with conserving or improving seasonal ranges and migration corridors. And it is also inconsistent with actions that avoid development, minimize habitat fragmentation, and limit disturbances to big game.

153.    Well-settled science confirms that increased human activity *negatively* impacts big game (including elk, mule deer, and pronghorn), as the Idaho Department of Fish and Game has explained to the Bureau several times.  The Bureau's own wildlife biologist characterized the project as providing "thoroughfares for human activity" in the planning area.  *Id.* (report at 27).  And in reviewing the scientific literature, the biologist correctly recognized that big game "may alter their behavior to focus on active threats or flee to avoid a perceived threat." *Id.*  The wildlife report "assumed that *displacement* and *avoidance* behaviors would *increase* as the volume of human use increases in the presence of animals." *Id.* (emphasis added).

154.    It is, after all, well established in scientific literature that the "displacement of big game may limit habitat effectiveness and may contribute to elk depredation issues on adjacent private lands." *Id.*  In short, reducing "habitat use is a form of *habitat loss*" for big game in the project area.  *Id.* (emphasis added).  The project does *not* conserve or improve big-game habitat, and the project does *not* conserve or improve big-game seasonal ranges or migration corridors, such as the migration routes used by the Mt. Borah mule deer herd and the Antelope Creek mule deer herd identified in the 2020 Ungulate Report (or even the Owinza mule deer herd identified in the 2025 Ungulate Report).

155.    The Bureau failed to adequately address concerns raised by its own wildlife biologist and by the Idaho Department of Fish and Game.

156.    The Bureau did not even identify the Mt. Borah and Antelope Creek mule deer herds and their migration routes by name, let alone analyze potential impacts to these herds in the vicinity of their seasonal ranges near Lake Creek Canyon.  The Bureau "offered no reasoned analysis whatsoever in support of its conclusion," *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011), that *expanding* trail-based recreation in the Wood River Valley—especially in the vicinity of Lake Creek Canyon—will not significantly affect big game.

157.   The Bureau's "general discussion" of migration corridors in the project area cannot suffice, as the environmental assessment "made no effort to analyze any particularized impacts or even to describe" the migration routes and seasonal ranges used by the Mt. Borah mule deer herd and the Antelope Creek mule deer herd. *WildEarth Guardians*, 135 F.4th at 736.  "By evaluating only generic effects" on big game, the Bureau "failed to take a hard look at the varied impacts that are likely to result from the proposed" project.  *Id.*

158.   Even after the Bureau approved this project, the agency still has an ongoing "duty to take a hard look" at new information that may require supplemental NEPA analysis.  *March*, 490 U.S. at 385; *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008).  If "an agency determines that new information is significant, it must prepare a supplemental EA or EIS." *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000).

159.   Here, the Bureau has an ongoing duty to take a hard look at new information in the 2025 Ungulate Migration Report—as well as the 2020 Ungulate Migration Report—and to consider whether that new information requires further analysis.  The Bureau thus far has failed to recognize that three different herds of mule deer (Mt. Borah, Antelope Creek, and Owinza) rely on habitat, seasonal ranges, and migration corridors near Lake Creek Canyon.

160.   An agency action is arbitrary and capricious under the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs v. State Farm*, 463 U.S. 29, 43 (1983).  The agency "*must examine* the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (emphasis

added).  Because the Bureau failed to do that here in analyzing impacts to big game, its decision to approve the project must be "set aside."  5 U.S.C. § 706(2).

## COUNT II:  Violation of NEPA
### The Bureau did not meaningfully consider cumulative impacts to big game.

161.  Idaho Migration Alliance incorporates by reference the above paragraphs (¶¶ 1–142) as if set forth here.

162.  The Council on Environmental Quality defined a cumulative impact as an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7 (2021).  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*; *see also* EA page 14.

163.  To comply with NEPA, an agency must analyze the cumulative impacts of a project by providing "some *quantified* or *detailed* information" to the public, as generalized statements "about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (quoting *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)) (emphasis added).  Perfunctory analyses cannot suffice.  In this case, the Bureau's analysis falls short of that standard.  *See id.*

164.  For example, in the context of accessing public lands, the environmental assessment summarized under Section 3.3.2 environmental impacts common to the project alternatives considered by the Bureau.  *See* EA pages 24–27.  The Bureau explained that it considered cumulative impacts only in the planning area.  *Id.* at 26.

165.    The Bureau concluded that the "proposed actions" will "provide sustainable trails that can be used for future generations," and the Bureau found that the project will "cumulatively have a moderate long-term *beneficial impact* regarding access to and through public lands." *Id.* at 27 (§ 3.3.2.6) (emphasis added).

166.    But the Bureau did not explain how increased public access to big-game habitat and to big-game seasonal ranges can be considered a beneficial impact "*on the environment*." 40 C.F.R. § 1508.7 (2021) (emphasis added).  It is not.

167.    The Bureau purported to consider cumulative impacts to big game.  *See* EA page 33.  In its analysis, the Bureau recognized that elk and mule deer "migrate through or utilize seasonal habitats in the planning area."  *Id.*  The Bureau also recognized that the vast majority of the project activities will occur in two game management units (referred to as GMU's).  "The impact of the development and attendant use would *disturb* and *fragment* big game habitats amongst all seasonal use periods within these GMU's but would impact *winter and migration habitat the most*."  *Id.* (emphasis added).

168.    The Bureau found that project impacts "to big game and their habitats would occur over time and would *increase* as the population growth of the increases." *Id.* (emphasis added).  Indeed, the Bureau stated that each action alternative cumulatively "*increases* impacts to big game." *Id.* (emphasis added).  But the Bureau nevertheless found that overall cumulative impacts from the project remain "minor." *Id.* The Bureau provided no meaningful explanation as to how that could be accurate.

169.    According to the Bureau, the agency will rely on unspecified "design features and education efforts to inform recreation users of big game conflicts," and those efforts somehow will "reduce impacts" to big game and "not result in impacts that would obstruct viable populations in impacted and surrounding GMU's." *Id.* But that makes no sense.

170.    "Cumulatively," the Bureau found that the projects "alterations" to big-game habitat combined with "ongoing disturbances to animals and their habitats is not expected to result in more than minor cumulative effects to big game." *Id.* Again, however, that makes no sense, particularly in light of the comments submitted by the Idaho Department of Fish and Game and the analysis conducted by the Bureau's own biologist in the Wildlife Specialist Report.

171.    The Bureau's generalized statements about cumulative impacts to big game do not comply with NEPA because the Bureau provided no quantified or detailed information specific to big game in its analysis. *See, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011).

172.    And, as discussed above, the Bureau did not consider scientific information published in the 2020 Ungulate Migration Report in its analysis of cumulative impacts from this project even though that report had been published the year *before* the project was approved and *before* the Bureau issued the final environmental assessment.  Impacts to the Mt. Borah mule deer herd and to the Antelope Creek mule deer herd certainly were "foreseeable." *Id.*

173.    The 2020 Ungulate Migration Report identified migration corridors and seasonal ranges in the planning area, and the report provided detailed information meant to improve "critical on-the-ground management and conservation" decisions made by agencies like the Bureau of Land Management.  Exhibit E (Report at 3).  Yet the Bureau did not consider any information from the 2020 Ungulate Migration Report.

174.    Courts do not require agencies "to do the impractical, if not enough information is available to permit meaningful consideration." *Env't Prot. Info. Ctr. v. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (internal quotation marks omitted). But that is nowhere near what happened here.  The Bureau had more than enough information available to the agency from the 2020 Ungulate Migration Report, and

that scientific information could have been used by the Bureau to meaningfully consider the overlapping migration corridors and seasonal ranges used by the Mt. Borah mule deer herd and by the Antelope Creek mule deer herd in the project area.  Yet the Bureau did not consider the report or the best available scientific information about the big-game migration corridors and seasonal ranges in its analysis.

175.    On this record, Idaho Migration Alliance properly has established "the potential for cumulative impact" on big game, their habitats, and their migration corridors.  *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010).    The Bureau's analysis of cumulative impacts "was insufficient, and therefore violated NEPA."  *Id.* at 606.

## COUNT III:  Violation of NEPA
### The Bureau relied on incorrect assumptions or incorrect data.

176.    Idaho Migration Alliance incorporates by reference the above paragraphs (¶¶ 1–142) as if set forth here.

177.    As explained above, NEPA requires an agency to take a "hard look" at environmental impacts in its analysis of a project.  *Robertson*, 490 U.S. at 348.  "To take the requisite hard look, an agency 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts."  *Env't Def. Ctr.*, 36 F.4th at 872 (quoting *Native Ecosystems Council*, 418 F.3d at 964).

178.    The Bureau violated NEPA because it relied on incorrect assumptions or incorrect data regarding an unauthorized user-created footpath and unauthorized trails in the vicinity of Lake Creek Canyon, through which the migration routes for both the Mt. Borah mule deer herd and the Antelope Creek mule deer herd pass.

179.    In its analysis, the Bureau recognized that "unauthorized activity"—i.e., routes "created and/or constructed without permission across BLM, State and private lands"—"has resulted in *increased impacts* to natural resources and disturbance to

wildlife species, including deer and elk, during the winter months; especially recreation activity during winters when enough snow is present for backcountry skiing and snowmobiling off-trail." EA page 16 (emphasis added).

180.    Even so, the Bureau glossed over unauthorized activity in the vicinity of Lake Creek Canyon, where a user-created footpath crosses through the Sun Peak Area of Critical Concern and traverses big-game habitat, seasonal ranges, and migration corridors.

181.    The Bureau relied on incorrect assumptions or incorrect data as it considered potential environmental impacts from the unauthorized user-created foot path that branches off from the private White Clouds subdivision trail network north into Lake Creek Canyon and then traverses BLM land. The unauthorized user-created foot path not only traverses through the Sun Peak Area of Critical Environmental Concern, but it also passes through big-game habitat and through the migration corridors and seasonal ranges used by the Antelope Creek mule deer herd and by the Mt. Borah mule deer herd. But the Bureau did not consider whether the unauthorized user-created foot path has resulted in increased impacts to big-game habitat and increased disturbances to big game, including elk and mule deer. It appears that the Bureau missed the user-created foot path entirely.

182.    The Bureau also mischaracterized BLM Trail 998A and USFS Trail 998B. In its analysis, the agency incorrectly concluded that these trails can provide recreational opportunities without any adverse impacts to big game. Again, however, the Bureau relied on incorrect assumptions or incorrect data as it considered potential environmental impacts from these two routes.

183.    Importantly, there is *no* authorized access to BLM Trail 998A. The Bureau incorrectly assumed that BLM Trail 998A somehow connects to the existing private trail network constructed by the Sun Valley Company near the White Clouds subdivision. It does not. BLM Trail 998A ends abruptly in Lake Creek Canyon near

the Sun Peak Area of Critical Environmental Concern, somewhere close to the unauthorized user-created footpath. BLM Trail 998A does *not* connect to the existing private trail network near the White Clouds subdivision.

184.    Nor does BLM Trail 998A connect to an existing trail in the other direction. BLM Trail 998A terminates below the ridge that separates Lake Creek Canyon from Taylor Canyon. It is fragmented and cut off.

185.    There once was a proposed Forest Service trail—referred to as USFS Trail 998B—that potentially could have connected to BLM Trail 998A. But that proposed trail was *never authorized* by the Forest Service. It does not exist.

186.    In violation of the APA, the Bureau did not engage in a "logical and rational" decision-making process as the agency approved BLM Trail 998A and expanded recreational activities in the vicinity of Lake Creek Canyon. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

## COUNT IV:  Violation of NEPA
### The Bureau failed to prepare an environmental impact statement.

187.    Idaho Migration Alliance incorporates by reference the above paragraphs (¶¶ 1–142) as if set forth here.

188.    The stated purpose of the project is to expand trail-based recreation in the Wood River Valley, and the Bureau claims that the project will result in several unspecified "environmental benefits." Exhibit H (decision at 2). Yet there is "considerable scientific evidence" in the record suggesting otherwise. *Bark*, 958 F.3d at 870. "Considering both context and intensity, as required by 40 C.F.R. § 1508.27, this evidence raises substantial questions about the Project's environmental impact, and an EIS is required." *Id.* (citing *Blackwood*, 161 F.3d at 1212; *Native Ecosystems Council*, 428 F.3d at 1238–39).

189.    This project is "highly controversial" under  40 C.F.R. § 1508.27(b)(4) because there is a substantial dispute in the record as to the effects on big game. The

project provides no "environmental benefits" to big game.  To the extent that the Bureau considered adverse impacts on big game to be minor or moderate, the Idaho Department of Fish and Game challenged that conclusion as unsupported.  "A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals*, 751 F.3d at 1069 (quoting *Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 772, 736 (9th Cir. 2001)).

190.   Of course, mere opposition to the project, standing alone, "is insufficient to support a finding of controversy" under 40 C.F.R. § 1508.27(b)(4).  *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019).  Courts instead must consider whether substantial expert opinion in the administrative record disputes the agency's conclusions.  On this record, it does.  That dispute exists.

191.   The Idaho Department of Fish and Game consistently raised concerns to the Bureau about trails that negatively impact wildlife and critical habitat, especially big-game habitat in the vicinity of Lake Creek Canyon.  The Bureau not only ignored those concerns, but it also ignored the 2020 Ungulate Migration Report, which was meant to "provide the means for the habitats required for migration *to be taken into account*."  Exhibit E (report at 1) (emphasis added).  That is not all.  The Bureau ignored Department of Interior Secretarial Order 3362, which requires the Bureau to work with state partners—e.g., the Idaho Department of Fish and Game— "to conserve and/or improve priority western big-game winter range and migration corridors."  Exhibit D (order at 2).

192.   In its environmental assessment, the Bureau "did not engage with the considerable contrary scientific and expert opinion." *Bark*, 958 F.3d at 871.  The Bureau instead offered only general statements about "possible" effects and "some risk."  That cannot suffice.

193.    The project's negative impacts on big game—especially near Lake Creek Canyon, where the Mt. Borah and Antelope Creek mule deer migration corridors and seasonal ranges are located—"are highly uncertain," 40 C.F.R. § 1508.27(b)(5), because the Bureau did not analyze them in any meaningful way.

194.    Thus, the Bureau's decision "not to prepare an EIS was arbitrary and capricious." *Bark*, 958 F.3d at 871.

## COUNT V:  Violation of FLPMA
## The project does not protect big-game habitat.

195.    Idaho Migration Alliance incorporates by reference the above paragraphs (¶¶ 1–142) as if set forth here

196.    The Federal Land Policy Management Act requires the Bureau to "manage public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a).  To comply with the Act, the Bureau must *balance* the competing uses to which federal lands can be put.  *Norton*, 542 U.S. at 58; *see also* Exhibit B (Letter at 5) (urging the Bureau to consider a planning "compromise"—i.e., to balance "reasonable public access" and "wildlife habitat protection").

197.    In this case, the Bureau claims that the project sustains the health, diversity, and productivity of public lands in the planning area.  Exhibit H (decision at 2).  The Bureau also claims that the project has "numerous" economic, social, and "environmental benefits."  *Id.*  But these claims cannot survive scrutiny, as the Bureau improperly has prioritized perceived recreational benefits to the detriment of wildlife, especially to big game.  The Bureau improperly approved project activities that will have long-term adverse impacts to big game.

198.    The governing land use plan (at BW-1)—i.e., the 1981 Sun Valley Management Framework Plan as amended by the Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management Plan Amendment—describes the Big Wood Analysis Unit, in which the Bureau approved this project.  The plan

states that the Bureau will manage federal lands "to *protect*" open spaces, scenic values, and "*wildlife habitat*" (emphasis added); *see also* Exhibit H (decision at 2).

199.   Contrary to the Bureau's summary of its analysis in the decision record, the project does not protect big-game habitat.  Nor does the project comply with Secretarial Order 3362, which requires the Bureau to work with state agencies "to *enhance* and *improve* the quality of big-game winter range and migration corridor habitat on Federal lands under the management jurisdiction" of the Interior Department "in a way that recognizes state authority to conserve and manage big-game species."  Exhibit D (Order at 1) (emphasis added).

200.   This project neither enhances nor improves big-game habitat.  Instead, the project approves trails designed specifically to *increase* recreational activities throughout the planning area, which includes seasonal ranges and migration corridors used by big game.  The Wildlife Specialist Report confirms that project activities will "expand recreation use on the landscape with varying degrees of disturbance and *habitat loss*."  Exhibit G (report at 45) (emphasis added).  It may be that the habitat loss is "variable" throughout the planning area, *id.*, but that observation does not get the Bureau very far.

201.   The Bureau acknowledges that the "greatest habitat loss and disturbance from attendant use would occur in shrubland habitats" used by big game.  *Id.*  But that is not all; the adverse impacts to big game are not limited to habitat loss.  The project is "anticipated to have *long-term adverse impacts* to wildlife resources" in "all seasons and habitat types, but the greatest impacts are anticipated to occur to *wintering big game animals*."  *Id.* (emphasis added).

202.   By its plain terms, the project does not enhance or improve the quality of big-game seasonal ranges and big-game migration corridors.

203.   The project was designed specifically to *expand* trail-based recreation in the planning area, and the Bureau's own biologist recognized the project will result

in "a *net increase* in human activity including during the winter season in occupied big game winter habitats." *Id.* (report at 29) (emphasis added). With more people using more trails, the Bureau's wildlife biologist rationally explained that the project will "increase interactions between wintering big game and recreation users." *Id.*

204.  The biologist added that the planning area "is known to support wintering big game animals, and recreation activity would be expanded under all action alternatives that could occur each day with some trails potentially experiencing high amounts of activity." *Id.*

205.  This Court should set aside the Bureau's decision to approve the project because the agency did not comply with the Federal Land Policy Management Act.

## Prayer for Relief

Plaintiff Idaho Migration Alliance respectfully prays for judgment:

(a)    Declaring that the Bureau of Land Management did not comply with the National Environmental Policy Act in approving the project;

(b)    Declaring that the Bureau did not comply with the Federal Land Policy Management Act in approving the project;

(c)    Setting aside the Bureau's decision to approve the project;

(c)    Ordering the Bureau to prepare an environmental impact statement on remand;

(d)    Granting injunctive relief barring the Bureau from implementing project activities in the vicinity of Lake Creek Canyon and from engaging in unlawful actions on remand;

(e)    Awarding Idaho Migration Alliance reasonable attorney's fees, costs, and expenses; and

(f)    Granting any additional relief as may be just and proper.

Respectfully submitted,

GIVENS PURSLEY LLP


*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert

September 5, 2025